All rise. Be honorable. The United States Court of Appeals for the First Circuit is now in session. Court is in session. You may be seated. Judge Lynch, if I may, would it be alright if I begin? Please do. Thank you, Judge. Today's cases will be called as previously announced and times will be as allotted to counsel. The first case today is District 4 Lodge of the International Association of Machinists and Aerospace Workers Local Lodge 207 et al. v. Gina M. Raimondo et al. Appeal Number 21-1873 and District 4 Lodge of the International Association of the Machinists and Aerospace Workers Lodge 207 et al. v. The Center for Biological Diversity et al. Appeal Number 21-1874. Attorney Herron, please introduce yourself for the record and proceed with your argument. May it please the court. My name is Rachel Herron on behalf of the federal government. To court's awareness, I intend to take 12 minutes of the time allotted to appellants and if possible, I'd like to reserve three minutes of that time for rebuttal. You may have it. Thank you, Your Honor. A preliminary injunction is an extraordinary remedy never granted as of right. This court has already explained in a published opinion why the preliminary injunction at issue in this appeal did not meet that high bar. In determining that plaintiffs were likely to succeed on the merits of their challenge to the science underlying the National Marine Fisheries Service's rule protecting the North Atlantic right whale, the district court, quote, misapprehended the record and overstepped its role in rejecting the judgments of the agency. Because the requirement to show likelihood of success on the merits is, in this court's words, the main bearing wall of the multi-part injunction test, this court should overturn the preliminary injunction on that ground alone. Should this court reach the remaining injunction factors, the, quote, to say the least, sketchy evidence of irreparable injury that plaintiffs have presented and the district court's second guessing of the policy determination set by Congress in the Marine Mammal Protection Act provide additional independent bases for reversal. Unless the court would prefer otherwise, I would turn first to the likelihood of success on the merits. With regard to the merits, I think it's important to keep in mind that there is no dispute in this case that the North Atlantic right whale is one of the most critically endangered species on the planet, nor is there any dispute that the Marine Mammal Protection Act required the service to issue a take reduction plan aimed at bringing the number of white whales that are killed or seriously injured by entanglement with the lobster fisheries equipment down below a regulatory target that the plaintiffs have not challenged here. The only thing that the plaintiffs have challenged is whether the record adequately supports one element of the suite of protections that the National Marine Fisheries Service instituted, specifically a limited seasonal restriction on using vertical buoy ropes to catch lobster in one slice of the Gulf of Maine. When viewed under the appropriate principles of administrative review, that challenge has no likelihood of success on the merits. This court already well explained in the stay opinion why the district court erred and misapplied those principles of administrative review when it won't belabor that point here unless the court would like to specifically discuss the district court's analysis. Let me ask you the stay opinion which Judge Gallardo and I were on the panel, is there anything from that day up to now that has changed in the government's position in that case or everything else remains in so far as the analysis in that opinion? Everything remains the same, Your Honor. The government fully agrees that that opinion got it right with regard to the likelihood of success on the merits with regard to the balancing of the equities. I know that that opinion did not stop short of specifically finding that there was a failure to demonstrate irreparable injury and that the district court abused its discretion in finding otherwise, but the government does believe that the district court did abuse its discretion on that point as well. The only possible piece of information that this court should know is that as this, Your Honor, is aware, at the point that the court was considering the stay, the plaintiffs invited this court to look beyond the record at the new real-time data that the agency has been posting about where whales are detected in relation to this restricted area and the court did so, found that that information supported what the agency did here. In fact, there has been more information that's been posted then at the same length that this court referenced in its opinion and that information shows that during the period of the closure this year, there were, in fact, additional detections of whales in the restricted area. So I think given the... Is what you just said, is that outside the record? It is indeed, Your Honor. It's simply, this court doesn't need to take that into account, but because the court looked at that data when it was addressing the stay opinion, I think it's worth noting that, if anything, that information only provides more support now than it did then. Is this from the same source as the other information that your opposing party asked us to consider? That's correct, Your Honor. It's the real-time acoustic glider data at the length that was in the court's opinion. And then one of their... One of the things that caught the district court's attention and I think prompts some of the argument is that we're dealing, as I understand it, with probabilistic predictions of harm to the whales and the probabilistic prediction is itself of a relatively small absolute number. What do you have to say? So we're down under one on one scenario. So what do you have to say on that? Right. So, Your Honor, the... All of the regulations that are involved in this issue take place against this background of the reality that the level, the target level for loss of whales here is that the population can't lose even one a year. Here, the agency candidly acknowledged that there are some uncertainties in the data set about where whales are and where lines are. That's not at all surprising given that we're dealing with a species that travels broad swaths of open ocean and that is itself rare and declining and that we're dealing with an industry that has historically resisted efforts to provide detailed information on exactly where lines are. The agency nevertheless explained that it had no reason to doubt the hard information that it had, that evidence that all went into the modeling that the agency performed, and the plaintiffs have not pointed and the district court did not point to any available evidence that would undermine that conclusion or that would undermine its burden here, and it was within the agency's scientific discretion to decide what scientific modeling method it was going to use to evaluate the information that it had available. Unless, Your Honor, I have additional questions, I would be happy to cede the podium to the other appellants at this time and reserve the remaining time for rebuttal. Thank you. We accept your offer. Thank you, Attorney Herron. Once you've taken your seat, Attorney Moncel, you can please proceed to the podium, introduce yourself, and begin your argument. Good morning, and may it please the Court, Kristen Moncel, on behalf of conservation groups who collectively represent hundreds of thousands of members throughout Maine and Massachusetts and across the country who are concerned about the survival and recovery of the North Atlantic right whale, which is now one of the most endangered animals on earth. With less than 360 individual whales left, the population has lost all recovery gains over the last 20 years, primarily because of entanglements in commercial fishing gear. And today, I'd like to briefly touch on how these unassailable facts show that the District Court abused its discretion in finding that the public interest and balance of the equities favor the injunction. In fact, here, the injunction is directly contrary to the public interest and the congressionally declared national priority of saving endangered marine mammals. Entanglements in commercial fishing gear, which kill right whales and also have serious harms on their individual health and reproductive rates, are driving whales to the brink. The agency established the restricted area here to help prevent that very reality and protect whales in an area where there's a deadly trifecta, where whales overlap from October through January with a high density of heavy gear, creating not only a heightened risk of entanglement, but a heightened risk of a deadly entanglement. And eliminating these lines in this area during these times is the only proven way to eliminate this risk. In other words, the restricted area provides critically important protections from the primary threat to the right whale's continued existence. Yet the District Court failed to properly consider these facts, or even really grapple with the incredibly dire status of the right whale. It also failed to properly heed the directive from Congress, from the Supreme Court, and from this court in Strahan v. Cox, that the public interest and balance of equities tip heavily in favor of endangered right whales. And that's especially true here, where on the one side you have a population that's doing so poorly that, as this court has already recognized, even one additional death per year increases the chances that the right whale will go extinct. And on the other, you have fewer than 125 fishermen out of nearly 5,000 permitted to fish off Maine that will be displaced or crowded in their fishing grounds for four months out of the 12-month season, which simply cannot trump the incalculable value of saving the right whale. In short, this court got it right in granting an emergency stay of the injunction pending appeal, and we ask you to now overturn that decision for good. Thank you. Thank you, counsel. Thank you, Attorney Monsell. Attorney Frawley, please take the podium and proceed with your argument. Thank you. May it please the court, Al Frawley for the appellees. Your honors, lobstering is the only way for people to make a living on the coast of Maine, especially in the winter. This is a very, very big deal. When you're preventing people from literally earning the livelihoods that they and their families have been earning for generations, you have to do it based on something more than speculation. District Court here wasn't second-guessing the agency's decisions. It was saying you can't rely on speculation when there is better evidence out there that's available. The government has the ability to tag and track whales. It doesn't. It has the ability to model copepod distribution, what the whales eat, to figure out their migratory patterns. It doesn't do that. It has the ability to conduct aerial surveillance. It doesn't do that over the area that we're talking about, and it doesn't engage in genetic testing, which four whales were just recently found using genetic testing. There are tools available to get better data, so we're regulating based on science and not speculation. That's all the industry wants, is regulations that are fair based on the best available science. It also wants to be treated fairly vis-a-vis other industries. The government has not regulated or analyzed fishing activities in the southern states where whales breed. They use trap hot gear. They use gill net gear. The government hasn't looked at those areas, even though it's undisputed whales aggregate there. It hasn't regulated gill nets in connection with this rule, even though gill nets are responsible for almost half of known causes of entanglements. It's using an outdated predictive model that inputs a long-term average of where whales are and where they're not since 2003. Peer reviewers have said, you can't rely on that average anymore because climate change is shifting their distribution, and even though climate change is shifting their distribution up north to Canada, the government at the time it regulated didn't upload and analyze acoustic recordings. It had them. It didn't upload and analyze them. The key point in this, your honors, is the district court focused on where whales aggregate, and I'm not sitting here trying to say that the government only has to focus on where whales aggregate, but it has to do that first. You can't look at an area where it's undisputed whales are leaving and shut that area down when you haven't studied the areas where whales are aggregating. Why does that follow, Mr. Frawley? Because the fatality is a function of aggregation times opportunity for harm, i.e., lines. Two times three is six, and three times two is also six. Isn't that what we have here? You have two factors, two variables, aggregation, line, density. They've looked at this area, which has a very heavy line density. Therefore, even a relatively low factor for aggregation is going to be estimated to produce a fatality. What's wrong with that expert analysis? Because ten times one, your honor, is ten. If you can put one fisherman out of business to save ten whales, doesn't that make much more sense than putting a hundred fishermen out of business to possibly save one whale? And that's the problem here. If the government had looked at the totality of the picture, all the areas where whales aggregated, all the threats, and determined this area was still needed to achieve the risk reduction rate, fair enough. Now what you're saying is that, contrary to what you argued before, you're not saying that the estimate of a fatality that would occur but for this regulation is inaccurate. What you seem to be saying is there were other ways with other regulations in other areas that could have produced the same or fewer beneficial effects. I'm not saying that, your honor, and apologize if I've misspoke. And I'm not quite understanding you. I thought you were saying that they could have done something elsewhere that would have saved more whales. But they could have done that, but what they did was also inaccurate because they used historical averages that are outdated for the number of lines, the line density that your landings information, not offshore landings information, so it's completely inaccurate. In terms of gear strength, they didn't factor in all the weak links or other modifications to gear that have happened since 2009. So it's predicting something that's going to happen in an area where science tells us that it's not and where all the past regulations tell us that this should have improved. They're comparing apples and oranges and they're not doing it to protect the whales, they're doing it to make sure that Maine complies with 60% reduction in lines in the water. Last time when you made this point, one of the questions was, well, what else should they have looked at? And you filed a brief saying we should look at sonar results. And so we did look at those and don't they show just what the government is saying? No, your honor, they don't. And if you find print is they can't tell if it's a right whale or a humpback whale. So then why don't you want to get back to the district court right away rather than being before us again on preliminary issues and get to a final fact find? I do, your honor. This was not my appeal. I mean, we moved promptly in this court to get our injunction. They challenged that they got to stay. I do want to get back. And that's what the district court was focused on. It said, based on the limited record for me, I don't see any evidence that these inputs are real based on real science. It left open the possibility that they could show the record. They could show what your honor's talking about, these acoustic detections, but that none of that was before the court. Qualified expert says something and you say something and the agency agreed with the qualified expert. What role do we have? And then saying, as long as that expert is qualified, why wouldn't we find the agency's decision to rely on that rather than you is relying on substantial evidence? I would certainly agree. You should listen to the qualified experts more than me, your honor. But if you listen to the qualified experts and what's in that record is the qualified experts are saying, no, you should not use this model to impose closures because the data isn't good enough. They're saying you can't use these long term averages over 20 years because climate change has shifted their habitat. They say you can't use the gear strength metrics that they use because you haven't analyzed those and it's not a real factor. They say you can't use the predictions of line density in the water because it's based on pure viewers didn't agree with it. They don't agree with the assumptions that 50% of all entanglements occur in U.S. waters when the hard data, and I'm not saying that we know the source of every entanglement, but I am saying we know the source of 54% of entanglements. Canadian gear is four times more likely to cause entanglement. That's based on the hard data. If you think of it like a poll, you have a random sampling that's supposed to be representative. Here you have 54%. That's a representative sample. It says Canadian gear is four times more likely to kill these whales, but yet we're assuming half of them occur here. The hard data that the district court looked at says gillnets cause almost half of entanglements, but here the government's assuming that all entanglements are caused by lobster gear in the northeast, even though the getting washed up on shores of Virginia, North Carolina. Counsel, if I may, I'd like to go back to Judge Kayada's question, which I believe you didn't actually answer when you leapt to your 10 to 1 argument. It seems to me that even though it was the United States that appealed, if it were in your client's best interest to proceed quickly to the merits of this case, rather than spending months coming to the Court of Appeals to challenge, without presenting any new arguments, the arguments that were already rejected, you could have worked out with the government a procedure by which the case would have proceeded quickly in the district court. Whatever we decide, this entire process is taking months, and have you in fact discussed with your client the desirability of getting to the merits and presenting all of these arguments with changed data to the district court? Absolutely, Your Honor, I have, and the problem is we have no ability to gather the data. That's the government's job. The government is not gathering it, so we can move to district court tomorrow and all will be as holes in the record and they'll continue to point to uncertainty. Six months from now, it'll be the same thing. What we were asking the district court to do is force them to look at these acoustic recordings, force them to do genetic testing, force them to do aerial surveillance, and then if all that data shows that this closure is still needed, fair enough, but right now people are losing their jobs, they're losing their homes, they're losing their boats. You didn't put any evidence in the record. I mean, you didn't put in a single affidavit from a single person saying I fished the area and I'm not going to be able to and this is what it's going to cost me. Well, Your Honor, first of all, it's very difficult to predict the impacts of this because it hasn't happened yet. Well, you didn't sound like that when you opened your argument. No, but I did put in evidence from the legislative director, one of the top people in the Maine Lobster Union, a lobster woman from Stonington, who said... Well, hearsay saying I talked to somebody who talked to somebody and here's what somebody said to somebody and now I'm saying to you in an inadmissible form in a federal court and then you add on to it in your oral presentation. But fair enough, Your Honor, but what she did say, which is not hearsay, is that Lobster 207, the cooperative owned by the union of which she is a member, of which she's a part of, stands to lose four million pounds at a time of the year when that's where they're buying it from. So if you're missing four million pounds, if the wholesale is missing four million pounds, it's four million pounds not being caught by the fishermen who are now being asked to get new rope, to buy weak links that aren't available, to replace their gear, to do all this stuff when they haven't had any income for the last four months and there's no evidence that a single whale was saved. We need to figure out where these whales are and we need to target those areas and that's what the district is saying. If I may, again, going back to the question I asked, which I don't believe you've really answered, what you asked the court for was an injunction against implementation of these regulations, yet you told me that you were asking the district court to require the government to do additional forms of testing to provide more information. That is not what the record shows. Have you given up on the idea of sitting down with your fellow council and trying to work out methods of getting better information? Two things, your honor. One, what we asked the district court to do was enjoin this closure because it was based on speculation, not hard evidence. Would you answer my question rather than making a speech? Yes, your honor. So to answer your question, no, we have not sat down with the government because we've been refused a seat on the take reduction team. They say that my organization should not be a part of it. That is an entirely a different issue. I'm making a suggestion to you if you want better data and you want to move this along. So your honor, my client is doing a number of things to try to gather data. It's working on a system where hopefully we can do genetic testing in pots by the lobstermen. We're modeling copepods with people that used to work at Amazon, but we have no forum to present that data. I mean, lawyer to lawyer is not the way this works. We can hash out the legal issues in a courtroom, but it has to be science to science. And right now we don't have a seat. All right. You've got 56 seconds left. What is your final statement, please? My final statement to the court, to my respected council, is that this is a huge deal. People are the state of Maine is going to lose its heritage. And it's all based on the fact that people are just guessing at what's causing this problem when data is out there that they could get and figure it out. The fact that they haven't analyzed the effectiveness of their regulation since 2009 and the problem is getting worse means they're not doing their job right. If they were targeting the right areas, targeting the right gear, the problem would get better, but it gets worse and worse because we're shutting down areas where the whales aren't and leaving areas open where the whales are. Thank you. Thank you. At this time, Attorney Herron has a three-minute rebuttal. Please introduce yourself back on the record to begin. May it please the court, Rachel Herron on behalf of the federal government. Your honors, in rebuttal, unless there are particular questions this court has, I would just make three points briefly. The first, with regard to hard data and whether this rule is supported by data, the government explained in its brief, and I am happy to provide additional record citations here to show that, in fact, all of the modeling that underlies this rule included the best hard data available, including historical data about where whales are and including all the data that is available with regard to where lines are. No one has pointed out any source of data that is currently available that has not been used. Which brings me to my second point, which is about this question of whether the agency had an obligation to collect different kinds of data. And your honor, the agency explained in the record that there are uncertainties in the data set. As I said, that is to be expected when you're dealing with this kind of species with this kind of range. But the agency nevertheless noted that it has quite a lot of information and that it has no reason to doubt the accuracy of that information. The question of whether the agency should delay taking action in an area where Congress has indicated that it should be moving immediately to reduce the number of entanglements of this species, when there would be, admittedly, perhaps a marginal benefit in getting more information, is the determination for the agency did so reasonably here. And that is all that administrative review requires. The last point I would make, your honor, is that there's quite a lot of focus in the presentation from my opposing counsel regarding whether this regulation is fair. And I would argue, your honors, that the record shows that, in fact, the seasonal restriction area is fair. In the first place, the suggestion that the United States is not regulating other fishing industries that contribute to entanglements is simply incorrect. The existing regulations for the Atlantic right whale include restrictions on the particular southern and gillnet fisheries that were referenced. The issue is that, right now, the agency, in light of the 2017 heightened mortality event, needs to revisit those regulations. And it is not arbitrary and capricious for the agency to decide that, in doing that, it was going to start with the fishery that no one has disputed contributes more than 90 percent of the lines in the water that right whales encounter. The agency also explained why it was And finally, I would note that Maine fisheries are only being asked here to do what every other fishery in the Northeast lobster fishery is being asked to do, which is to contribute its fair share of the reduction that its fishermen create. For that reason, your honor, we would ask that you take the next logical step after the stay opinion and overturn the preliminary injunction. Thank you, counsel. That concludes argument in this case.